IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
September 15, 2003 Session

## STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES
v.
## ERIKA EVERSON ET AL.

An Appeal from the Juvenile Court for Dyer County
No. 2970     Charles V. Moore, Jr., Judge

No. W2002-01085-COA-R3-JV - Filed December 11, 2003

This case involves the termination of parental rights. The two children lived with their single mother in Arkansas. The mother and children stayed temporarily with the children's grandfather in Arkansas, who sexually abused one of the children. After the grandfather threatened the mother, she and the children went to Tennessee and stayed with the children's grandmother. The mother went back to Arkansas and left the children with the grandmother in Tennessee. The grandmother repeatedly sought medical attention for one of the children. A physician determined that the child was a victim of Manchausen Syndrome by Proxy, a form of child abuse in which the caretaker exaggerates or secretly induces symptoms of illness in the victim and then seeks medical attention for the victim's "illness." Both children were taken into custody by the Tennessee Department of Children's Services. A permanency plan was designed for the children's mother. The mother failed to comply with the permanency plan, provide support for the children, or visit the children on a regular basis. In addition, she abducted the children from foster care and would not protect them from the abusive grandmother. The State filed a petition to terminate the mother's parental rights. The trial court granted the petition, and the mother appeals. We affirm, finding that termination of the mother's parental rights was warranted on several grounds and that termination was in the children's best interest.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

Barbara A. Deere, Dyersburg, Tennessee, for the appellant Erika Everson.

Douglas Earl Dimond, Nashville, Tennessee, for the appellee State of Tennessee, Department of Children's Services.

## OPINION

This is a tragic story of the cycle of abuse. Erika Everson ("Mother") an unmarried Arkansas resident, had two daughters, J.R. (d.o.b. 7/1/97) and P.E. (d.o.b. 7/17/98). Mother's parents divorced before she was born. Mother suffered abuse as a child. As an adult Mother was irregularly employed, and she and her daughters maintained a nomadic lifestyle. Even though her father ("Grandfather") had been abusive to Mother, she and her daughters sometimes lived at Grandfather's Arkansas home when they "had no place to go." In February 1998, J.R. was medically examined, based on a report of suspected sexual abuse by Grandfather. Subsequently, Arkansas child welfare services investigated the family for environmental neglect and failure to protect. A 1998 Central Registry Check showed true reports of environmental neglect, failure to protect, and malnutrition. At some point there was an investigation for sexual abuse, though the report of such abuse was not substantiated at that time

In January 1999, J.R., then an eighteen-month-old toddler, was diagnosed with genital warts, a sexually transmitted disease. Mother testified that, at that time, she began to suspect that Grandfather had sexually abused J.R. Nevertheless, in June 1999, after Mother and the children had to suddenly leave the home of her boyfriend, they returned to live at Grandfather's home. They left a month later when Grandfather became verbally abusive and Mother observed indications of physical and sexual abuse in her children. When she attempted to leave with her daughters, Grandfather held a gun to Mother's head and threatened to kill them.

Mother and the children fled to Tennessee to live with her mother ("Grandmother"). Mother remained there with her children for just over a month. In September 1999, she left her daughters in Grandmother's care and returned to Arkansas.[1]

While Mother remained in Arkansas, in late 1999 and early 2000, Grandmother sought medical treatment for J.R. for various stomach and gastrointestinal problems, such as refusing to eat or drink, vomiting, excessive sleeping, constipation, diarrhea, holding food in her mouth, stomach pain and problems swallowing. Examination by physicians, however, failed to substantiate the medical problems that Grandmother claimed to exist, and Grandmother and J.R. were referred for counseling with the LeBonheur Center for Children in Crisis in Memphis, Tennessee.

Finally, on February 4, 2000, J.R. was admitted to LeBonheur hospital. J.R. was subjected to a number of tests while at LeBonheur, and Grandmother was interviewed as well. The medical examinations did not substantiate the disorders reported by Grandmother; in fact, J.R. did well while hospitalized. Considering this as well as the interviews with Grandmother, the case was referred to Robert Van Walling, M.D. ("Dr. Walling"), a physician and the medical director of the LeBonheur Center for Children in Crisis.

---

[1]Mother would later explain that she returned to Arkansas to help the authorities locate Grandfather to take him into custody. She did not address why she remained in Arkansas in excess of five months.

Dr. Walling saw J.R. four days after she was admitted to LeBonheur. He examined J.R.'s medical records, as well as the records made by the social workers and others who had interviewed Grandmother at length or who had worked with the children, Mother and Grandmother in either Arkansas or Tennessee. He also interviewed Mother at length. Based on all of this information, Dr. Walling diagnosed that J.R. was a victim of a form of child abuse known as Munchausen Syndrome by Proxy, perpetrated by Grandmother. This type of abuse is characterized by the perpetrator either inducing symptoms of illness in the child through artificial means, such as the administration of a substance or drugs, the withholding of food, or the fabrication or exaggeration of such symptoms. The perpetrator then seeks medical attention for the victim, often repeatedly, for these induced or fabricated symptoms. The perpetrator is frequently very involved in the victim's medical treatment. This is thought to satisfy the perpetrator's emotional need for medical attention and nurturing. The hallmark of Munchausen Syndrome by Proxy is that, when the abuser is separated from the victim, the "symptoms" disappear. This type of abuse is known to have an inter-generational effect with families: children who have been victims of Munchausen Syndrome by Proxy sometimes inflict the same abuse on their children, or grandparents who perpetrated such abuse on their children may abuse their grandchildren in the same way. The consequences of Munchausen Syndrome by Proxy can be dire; as many as twenty percent of children abused in this way may die as a result of it.

Based on his investigation, Dr. Walling believed Grandmother, and not necessarily Mother, to be the perpetrator of the abuse. In Dr. Walling's interview with Mother, Mother acknowledged that she had been a childhood victim of abuse and had been in foster care as a child, and that Grandmother had manipulated her therapy and exposed her to hazards. Despite this, Mother indicated her intent to take only J.R. with her to Arkansas and leave J.R.'s younger sister P.E. in Grandmother's care in Tennessee.

Dr. Walling reported his findings to the State of Tennessee, Department of Child Services ("DCS") on February 10, 2000, recommending that both J.R. and P.E. be taken into protective custody, and that Grandmother not be permitted to see the children. The next day, DCS filed a petition for temporary custody of both J.R. and P.E. in the Juvenile Court of Dyer County, Tennessee, alleging that the children were victims of Munchausen Syndrome by Proxy perpetrated by Grandmother, that Mother would not protect the children from Grandmother, and that Mother could not provide a stable home for the children. DCS also requested a protective no-contact order against Grandmother. The Juvenile Court issued a "Protective Custody Order" placing the children into DCS custody and prohibiting Grandmother from having any contact with either of the girls.

Initially, when J.R. and P.E. were taken into protective custody, the goal was to reunite them with Mother. Toward that end, on April 6, 2000, DCS sent Mother, still residing in Arkansas, a permanency plan. The plan required Mother to undergo a complete psychological evaluation; to sign a release allowing records from the evaluation to be provided to DCS; to develop, with the assistance of her social counselor, a safety plan designed to protect her children; to comply with the no-contact order issued against Grandmother; to receive and complete psychological treatment to cope with the trauma of her own abuse; to develop independent living skills by obtaining stable employment or public assistance, appropriate child daycare, information concerning the use of community resources,

3

and a stable place of residence for at least six months; to complete a parenting class; to learn the characteristics of children diagnosed with "failure to thrive"; to establish support systems by joining a support group; to learn about Munchausen Syndrome by Proxy and recognize it as a probable disorder suffered by Grandmother; and to consistently visit the children. Mother was told by DCS on at least two occasions that if she moved from Arkansas to Tennessee, DCS would be able to provide her assistance in fulfilling the goals of the plan by, for example, helping her to find a job and locate housing. Mother declined to move from Arkansas.

DCS received a letter indicating that Mother had scheduled a psychological evaluation. However, DCS did not receive anything further to indicate whether the evaluation took place or to advise DCS of the results of any such evaluation. To further compound the problem, Mother refused to sign a release that would have permitted Tennessee DCS to communicate with her providers outside Tennessee to confirm Mother's completion of the plan's requirements.

In the summer of 2000, Arkansas child welfare services provided Tennessee DCS an Interstate Compact on the Placement of Children report ("Arkansas Report"), a report on the Arkansas agency's visit to Mother's home in Arkansas, to determine if Mother's home was appropriate for placement of the children. The report noted that the home was clean and Mother was employed. However, Mother was living with J.R.'s father, a convicted felon who was hiding from his probation officer. The report indicated that J.R.'s father had fathered four children by different women, none of whom received child support from him. During the visit by the Arkansas social worker, Mother acknowledged that Grandmother was the reason her daughters were taken into protective custody, and that Grandmother was not to have contact with the children if they were returned to her custody. Nevertheless, Mother listed Grandmother as a member of her extended family who was available to help if the children lived with her, and said that if custody was returned to her, she would try to change the diagnosis of Munchausen Syndrome by Proxy regarding Grandmother. The social worker reported that Grandmother left Mother's home when the social worker arrived, and returned again during the visit. Considering that Mother was living with a convicted felon, that Mother believed that the diagnosis of Munchausen Syndrome by Proxy regarding Grandmother was erroneous, and that Mother continued to involve Grandmother in her life, the report concluded that Mother's home was inappropriate for placement of the children.

During the nearly two year period after J.R. and P.E. were taken into protective custody, Mother saw them on only eleven occasions. For more than one of Mother's visits, Grandmother came along with Mother, in violation of the no-contact order against Grandmother.[2] The first time that Grandmother accompanied Mother for a visit, Grandmother was disingenuously described to the social worker as a "family friend." Mother continued to maintain that the diagnosis of her claim as victim of Munchausen Syndrome by Proxy perpetrated by Grandmother was not correct.

At Mother's February 2001 visit with J.R. and P.E., she absconded with the children. Three days after kidnapping the children from foster care in Tennessee, Mother turned the children over,

---

[2]Mother later explained that Grandmother came with her for some of the visits "as a driver."

4

physically unharmed, to Arkansas officials. Subsequently, Mother was convicted in Chester County, Tennessee of custodial interference and received an eleven-month-and-twenty-nine-day sentence and a fine of $1000 on March 14, 2001. All but ten days of her jail time was suspended. The court also issued a no-contact order, prohibiting her from seeing the children. Although the order stated that she could petition the Chester County court for relief from the no-contact order, Mother did not do so. Consequently, there were no more visits with the children.

On May 7, 2001, a petition to terminate Mother's parental rights was filed. The petition also sought to terminate the parental rights of J.R.'s father, Rick Roberts, and P.E.'s father, Shawn Willett. The trial was held on January 9th and 17th, 2002. The proceedings were held before Lyman Ingram, Juvenile Referee in the Juvenile Court for Dyer County, Tennessee. A default judgment was entered against the children's fathers, and the termination of their parental rights is not at issue in this appeal. Proof was heard regarding the termination of Mother's parental rights.

In the January 9, 2002 portion of the proceedings, the primary evidence heard was the testimony of Dr. Walling. Dr. Walling testified about his review of J.R.'s medical records and the records made by the social workers and others who had interviewed Grandmother at length or who had worked with the children, Mother and Grandmother in either Arkansas or Tennessee. Dr. Walling testified about seeing J.R. at LeBonheur hospital and his interview with Mother. He said that Grandmother's repeated assertions of various disorders in J.R. were not substantiated by the battery of medical tests performed on the child, and that J.R. in fact ate and did well while in the hospital, even gaining weight during the short time she was there. He testified regarding the basis for his conclusion that J.R. was a victim of Munchausen Syndrome by Proxy, perpetrated by Grandmother. Dr. Walling testified at some length about his interview with Mother, including testimony to the effect that Mother had told him that she had been the victim of sexual and emotional abuse as a child, that she had been placed in foster care as a child, that she had been in therapy more than once, that she had been victimized while in therapy, that Grandmother had manipulated Mother's therapy and exposed her to hazards, that Grandmother had not protected Mother as a child, that she had suffered repeated episodes of illness and victimization, and that she distrusted Grandmother. Dr. Walling also said that Mother expressed hopelessness and seemed to be in considerable emotional and social-setting instability, and was more focused on her own problems than those of her child. Dr. Walling testified that, despite Mother's statements about her own abuse as a child, she planned to take only J.R. with her to Arkansas and leave P.E. in Grandmother's care. Thus, he testified, he recommended that both children be immediately placed in protective custody and that Grandmother be prohibited from being in contact with the children.

The trial resumed on January 17, 2002, again before Juvenile Referee Ingram. The first witness was Tanya Tucker Watson, the Tennessee DCS case worker for the children who had investigated three referrals for possible abuse or neglect regarding multiple medical conditions reported by Grandmother which could not be substantiated medically. These referrals culminated in J.R.'s admission to LeBonheur hospital to address her "failure to thrive" and to evaluate Grandmother's unsubstantiated reports of J.R.'s medical problems. Watson explained that Tennessee DCS contacted Arkansas officials to ask them to accept the children's case because

5

Mother lived in Arkansas, and the Arkansas officials refused to do so because the children were no longer residents of Arkansas.

Watson described J.R.'s demeanor prior to being removed from the custody of Grandmother and Mother as very bashful, quiet, withdrawn and scared. Watson said that Grandmother and the children were provided counseling prior to J.R.'s hospital admission, but Grandmother did not complete the course of counseling, and efforts to persuade Grandmother to place the children in day care proved fruitless. After removal of the children from the care of Grandmother and Mother, Arkansas officials evaluated Mother's home in Arkansas and found it inappropriate for placement of the children. Arkansas officials did not participate further with Tennessee DCS.

Watson explained the DCS permanency plan proposed to Mother in order to reunite her with her children. Under the plan, Mother was to complete psychological evaluations and therapy to address her past abuse and the abuse of her children, abide by the order to protect the children from contact with Grandmother, obtain stable housing as well as either stable employment or public assistance, understand the abuse inflicted on her children, especially the Munchausen Syndrome by Proxy, utilize support systems in her community to prevent further abuse or neglect, attend parenting classes, and sign releases so that Tennessee DCS could be apprised of her progress and treatment. Since Arkansas had declined to accept the case, DCS encouraged Mother to move to Tennessee so that Tennessee DCS could provide help and services and monitor her progress. Mother, however, refused to leave Arkansas and provided Tennessee DCS little information on any progress she had made implementing the requirements of the permanency plan. In addition, Mother paid no support for the children.

During Dr. Walling's testimony on January 9, there were few objections to admissibility; the small number of objections lodged were to written documents sought to be admitted into evidence, such as an article by Dr. Walling on Munchausen Syndrome by Proxy. In contrast, in the proceedings on January 17, during Watson's testimony, numerous objections were raised, such as hearsay objections. Initially, the trial judge responded to individual objections. Shortly thereafter, however, the trial judge indicated that he would simply let both parties admit into evidence anything they chose, and that he would consider only undetermined portions of the evidence that were "pertinent" or "important." The trial judge explained:

THE COURT: As I've already said, now, I don't want a bunch of objections. I'm going to let things run wide open. I'm going to only consider those things that I think are pertinent. You can trust me. I'm not going to consider anything that's not pertinent.
. . . .
     I'm going to let both of you go as far as you want to go. I'm going to hear everything that you're wanting me to hear, but about 90% of it is going to go in one ear and out the other one.

6

Not surprisingly, further explanation of the trial court's reasoning was necessary:

> THE COURT: Let me explain one thing to you. The reason I'm doing this in this fashion, we've got two children involved here. The Court is not going to use strings of evidence in order to determine what's the best interest of these two children.
>
> I'm going to do what I think is the best for these two children when I hear all of the proof. And that's the reason I'm not limiting you. I want to hear everything that you've got, but at the same time a lot of it is not going to have any influence on me one way or the other.

The trial judge later added:

> THE COURT: I told you, I'm going to let everything in the record that you want to put in it. That way an appellate court can't say anything about me not letting it in.

The attorneys for both parties responded to this unusual approach by each making a "standing objection" to "any hearsay," to which the trial judge replied that he would accept the "standing objection" of both and promised to "consider only those things that are vital to our case."

The DCS case worker assigned to J.R. and P.E. after Watson also testified about DCS efforts to inform Mother of the requirements of the permanency plan, to encourage Mother to move to Tennessee so that DCS could assist her in meeting the requirements of the plan, and to facilitate Mother's visitation with the children. He also testified about DCS's actions when Mother absconded with the children and Mother's subsequent arrest and incarceration for custodial interference. Thereafter, Mother was not permitted to visit the children without court permission, which she did not seek.

The trial judge also heard testimony from Romaine Noles, the foster care case worker with West Tennessee Children's Home who worked with J.R. and P.E. Noles testified that when J.R. was first taken into protective custody she "was very guarded and untrusting of people. She refused to look at herself in the mirror. She did not like to smile for pictures. When she first came in, her teeth were really bad. . . . She had to have her top four front teeth pulled because they were decayed." Noles testified further that P.E. had bleeding sores all over her body from mastocystosis. She said that both girls had poor speech and both acted out sexually, touching themselves and each other in a sexual manner.

Noles described the progress the children had made. Though J.R. was still guarded, she had become more friendly with Noles and had begun making friends at pre-school. J.R. was no longer avoiding the mirror: "[S]he's got all these dress-up clothes. And she loves to play and dress up and look in the mirror." Both children had been taken to a dentist and treated for other medical problems. J.R.'s speech had improved considerably with therapy. They stopped acting out sexually about six months after entering custody. Noles described the personal achievements the children

7

were making:

> [T]hey're both doing just wonderful. . . . [P.E.] goes to the Kawana Center for physical therapy . . . [because] she had a hard time learning how to run and jump. She's made a lot of improvements with that, and they're both very smart. They know their ABCs and they're both learning to write their name. And they're both very independent, and they dress themselves and do everything they can for themselves.

Noles also testified about the girls' demeanor toward Mother during visits. Noles described J.R. as being reluctant both to permit Mother to take a photograph of her and to give Mother photographs taken by her foster family, crying when left alone with Mother, rejecting Mother's hugs and even telling Mother, more than once, that she did not love her anymore. Noles said that J.R.'s response to Mother's entreaties greatly upset Mother. She observed that, after visits with Mother, J.R. would again become guarded toward Noles.

Noles also described the children's reaction to the incident in which Mother absconded with them. When they were returned, she said, P.E. had "swollen all over her body," necessitating a doctor's visit the following day, and J.R. had a worsened ear infection and acute asthmatic bronchitis. In addition, both children's dispositions had changed. Both had once again become quiet and reserved. When asked if she had had fun, J.R. gave a blank stare, but when asked if she had been scared, J.R. nodded her head yes. Within an hour, their dispositions had returned to normal. However, for months thereafter, the children resumed acting out sexually.

Finally, Mother testified in her own behalf. She did not dispute talking to Dr. Walling about her own childhood, and did not specifically dispute telling him the experiences he recounted, but explained that Dr. Walling did not tell her why he was meeting with her. Mother said that she "may have mentioned" to Dr. Walling that she was sexually abused by Grandfather, but clarified that she did not know "for sure" that she had been sexually abused. She explained that she ended up bringing the girls to Grandfather's home because she had been "kicked out" by her boyfriend "with nowhere to go." After staying there several weeks and having Grandfather babysit the girls while she worked, Mother finally decided to leave Grandfather's home because Grandfather "started verbally abusing my daughter and I also saw other signs of possible physical or sexual abuse." They fled after Grandfather held a gun to her head. Mother continued to maintain that sexual abuse of her children by Grandfather was "never proven," even after J.R. was diagnosed as a toddler with genital warts. She admitted that she and her daughters continued to stay with Grandfather after J.R. was diagnosed with genital warts because she "really had no place to go."

Mother also maintained that she had never seen Grandmother do anything to hurt her daughters, but said that if she were ordered to protect them from Grandmother, she would do so. Nevertheless, she acknowledged that Grandmother had accompanied her to every court hearing and had accompanied her to visits with the children, regardless of the court order prohibiting Grandmother from being in contact with the girls.

8

Mother described her efforts to comply with the permanency plan, her sporadic employment, her lack of transportation, and her series of attorneys, whom she held responsible for not adequately informing DCS of her efforts.[3]  Mother admitted that she had never paid any support for her children.  She acknowledged that, at the time of the hearing, she was unemployed.  She explained that she was living with her fiancé at the time, and that he was willing to help Mother and her children if custody was returned to her.

On February 8, 2002, the trial court issued a written order terminating Mother's parental rights.  In its order, the trial court stated that it found that Dr. Walling's testimony "regarding the description of Munchausen's Syndrome by Proxy and the revelations of [Mother] to him in their conversation was credible."  The trial court noted Mother was dishonest in that she had absconded with the children in violation of a court order and tried to pass Grandmother off as a family friend so that Grandmother could see the children, also in violation of a court order.

In its written order, the trial court held: (1) that Mother "willfully abandoned" the children because she "willfully failed to pay child support or to engage in more than token support;" (2) that Mother "was incarcerated for all or part of four months immediately preceding the filing of this petition and has engaged in conduct prior to incarceration which exhibited a wanton disregard for the" children; (3) that although DCS "has made reasonable efforts to assist [Mother] to establish a suitable home for the children for a period of four (4) months following the removal, . . . [Mother] has made no reasonable efforts to provide a suitable home and . . . it appears unlikely that she will be able to [do so] at an early date;" (4) that "the conditions which led to [the children's] removal still persist [and] other conditions persist" that were unlikely to be remedied at an early date and would probably result in further abuse and neglect, thus preventing the children's return to Mother's care now or in the near future and diminishing their "chances of early integration into a stable and permanent home;" and (5) Mother "failed to comply in a substantial manner with those reasonable responsibilities related to remedying the conditions which necessitate foster care placement."  The trial court found that it was in the children's best interest to terminate Mother's parental rights.  From that order, Mother now appeals.

On appeal, Mother asserts that the trial court did not have jurisdiction to hear the case.  Mother also argues that the trial court erroneously admitted inadmissible and prejudicial evidence, thus preventing her from having a fair trial.  Finally, Mother contends that there was not clear and convincing evidence to support any of the grounds relied upon by the trial court to justify the termination of parental rights, nor to support a finding that the termination of parental rights was in the children's best interests.

Since this was a bench trial, we review the trial court's factual findings *de novo* accompanied by a presumption of correctness unless the preponderance of the evidence is otherwise.  Tenn. R. App. P. 13(d); ***Campbell v. Fla. Steel Corp.***, 919 S.W.2d 26, 35 (Tenn. 1996).  The trial court's

---

[3]Mother said that one attorney withdrew from representing her because they "didn't see eye to eye" and because "[h]e didn't like [her] momma."

legal conclusions are reviewed *de novo* with no presumption of correctness. ***Campbell***, 919 S.W.2d at 35. When the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge, who has the opportunity to observe the manner and demeanor of the witnesses as they testify, is in a far better position than an appellate court to determine credibility. McCaleb v. Saturn Corp., 910 S.W.2d 412, 415 (Tenn. 1995); Whitaker v. Whitaker, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). Therefore, the weight, faith, and credit to be given to any witness's testimony will be given great weight by the appellate court. In re Estate of Walton v. Young, 950 S.W.2d 956, 959 (Tenn. 1997); Whitaker, 957 S.W.2d at 837.

The standard for the termination of parental rights has been set out in previous cases:

> The United States Supreme Court has recognized the important nature of cases involving the termination of parental rights, stating that "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *M.L.B. v. S.L.J.,* 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer,* 455 U.S. 745 (1982) (Rehnquist, J., dissenting)). Accordingly, "the interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment." *Id.* The constitutional protections of the parent- child relationship require certain safeguards before the relationship can be severed. *See O'Daniel v.. Messier,* 905 S.W.2d 182, 186 (Tenn.Ct.App.1995) (*rev'd on other grounds, In re: Swanson,* 2 S.W.3d 180 (Tenn.1999)).
>
> As a safeguard, courts are required to apply the heightened "clear and convincing" proof standard. *See Santosky,* 455 U.S. at 769; *O'Daniel,* 905 S.W.2d at 186. To justify the termination of parental rights, the grounds for termination must be established by clear and convincing evidence. *See* Tenn.Code Ann. § 36-1-113(c)(1) (Supp.2000); *State Dep't of Human Servs. v. Defriece,* 937 S.W.2d 954, 960 (Tenn.Ct.App.1996). Evidence which satisfies the clear and convincing standard "eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence." *O'Daniel,* 905 S.W.2d at 188. "This heightened standard ... serves to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re M.W.A.,* 980 S.W.2d 620, 622 (Tenn.Ct.App.1998).

***In re Matter of Katherine C.***, 2001 WL 987137, at *2 (Tenn. Ct. App. Aug. 22, 2001). Thus, parental rights may be terminated only if there is clear and convincing evidence of grounds justifying such termination. ***Santosky v. Kramer***, 455 U.S. 745, 770-71 (1982); ***In re Drinnon***, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988).

As a threshold issue, Mother argues that Tennessee courts lacked jurisdiction to terminate Mother's parental rights in J.R. and P.E., since Mother was an Arkansas resident and the children were in Tennessee only temporarily. Under the Uniform Child Custody Jurisdiction and

Enforcement Act (UCCJEA), Tennessee courts have jurisdiction over a child if Tennessee is the child's home state on the date of the commencement of the legal proceeding. Tenn. Code Ann. § 36-6-216(a)(1) (2001). The child's home state is defined in the statute as "the state in which a child lived with a parent or a person acting as a parent for at least six (6) consecutive months immediately before the commencement of a child custody proceeding." Tenn. Code Ann. § 36-6-205(7) (2001). In this case, it is undisputed that J.R. and P.E. had lived in Tennessee, first with Mother and Grandmother and then with Grandmother only, for nearly seven months before they were taken into state custody. Mother admitted that she and the children moved to Tennessee in July 1999. In September 1999, she returned to Arkansas and left the children in Tennessee with Grandmother, who clearly acted as their parent until they were taken into state custody in February 2000. Arkansas officials declined to take jurisdiction for this reason. Clearly, Tennessee was the children's "home state" at the time they were taken into protective custody. This issue is without merit.

Mother also argues that the manner in which the proceedings were conducted violated her right to due process. She argues that she was prejudiced because the judge was under a disability due to his wife's illness, because approximately two years elapsed from the time the children were taken into custody to the trial determining whether her parental rights would be terminated, and because the judge admitted into evidence all of the hearsay evidence presented. The issue of whether Mother was denied her right to due process because the trial judge expressed concern at trial about needing to wrap up Dr. Walling's testimony in order to go home to care for his ill wife was waived because it was not presented at trial. *Simpson v. Frontier Cmty. Credit Union*, 810 S.W.2d 147, 153 (Tenn. 1991). The issue pertaining to the timeliness of the proceedings was likewise waived because Mother failed to raise it at trial.

The issue of the trial court's wholesale admission into evidence of any and all hearsay evidence is another matter. There were few objections to Dr. Walling's testimony on January 9, 2001, including his testimony regarding Mother's admissions to him about her own childhood abuse at the hands of Grandfather and Grandmother. In the proceedings on January 17, however, numerous hearsay objections were raised by both parties. These were cut short by the trial judge's admonition that he did not "want a bunch of objections" and his repeated blanket statement that he intended "to let things run wide open." The trial judge appeared to state that he would determine the admissibility of the evidence after hearing all of it. Rather than determining whether the evidence was admissible under the pertinent Rules of Evidence, however, the trial judge repeatedly "reassured" the attorneys that much of the evidence would "go in one ear and out the other" and that he would consider only evidence that was "pertinent" or "important."[4]

However well-intentioned the trial judge may have been, clearly this was a misguided manner in which to conduct the trial. While we agree with the trial judge's emphasis on the importance of determining the future of the children, and hasten to add the importance of determining the fundamental right of Mother to parent her children, this is not a reason to discard the Rules of Evidence. To the contrary, the Rules of Evidence, premised on basic notions of fair play, become

---

[4]This Court is unaware of an exception to the hearsay rule for evidence that is "pertinent" or "important."

11

even more essential in cases such as this, where the stakes are so very high.

Perhaps realizing the trial court's clear error, the State responds by asserting that, regardless, the direct, non-hearsay testimony of the witnesses and the admissions of Mother constitute clear and convincing evidence sufficient to terminate Mother's parental rights, and that any error by the trial court is harmless. In light of this, we turn to an examination of the evidence of grounds for termination of Mother's parental rights.

Under Tennessee statutes, the termination of parental rights must be based on:

(1) A finding by the court by clear and convincing evidence that the grounds for termination or parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36-1-113(c)(1) and (2) (2001). The grounds for termination are set forth in Tennessee Code Annotated § 36-1-113(g). Three of these grounds are at issue in this appeal: abandonment, substantial noncompliance with the permanency plan, and failure to remedy persistent conditions which prevent the child's return. These statutory grounds are set forth as follows:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the following grounds:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan . . .;

(3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s) still persist;

12

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(1)-(3)(A) (2001). Thus, if any one of these grounds is established by clear and convincing evidence, and it is established as well that termination of parental rights is in the child's best interest, then the termination will be upheld.

The definition of abandonment for purposes of an action to terminate parental rights is set forth in Tennessee Code Annotated § 36-1-102(1)(A). Generally, abandonment means that for a period of four consecutive months prior to the filing of the petition to terminate parental rights, the parent either willfully failed to visit the child or willfully failed to support the child. Tenn. Code Ann. § 36-1-102(1)(A)(i) (2001 and Supp. 2002). Where, as in this case, the parent has been incarcerated during a portion of the four-month period preceding the filing of the petition, a different definition of abandonment is applicable:

(1)(A) "Abandonment" means, for purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, that:

. . . .

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration which exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (2001 & Supp. 2002). Here, since Mother was incarcerated for a period of ten days in March 2001 for custodial interference after she absconded with the children during a visit, the pertinent time period is the four-month period preceding her incarceration. Mother admitted she paid no support at any time during the period of time in which J.R. and P.E. were in protective custody. This ground is established by clear and convincing, indeed undisputed, evidence.

13

The second ground for termination disputed by Mother in this appeal is substantial noncompliance with the permanency plan. Mother does not appear to argue that the requirements of the permanency plan were not " 'reasonable and related to remedying the conditions which necessitate foster care placement.' " ***In re Valentine***, 79 S.W.3d 539, 547 (Tenn. 2002) (quoting Tenn. Code Ann. § 37-2-403(a)(2)(c) (2001 & Supp. 2002)). Here it is clear that the requirements of the plan were reasonable and related to remedying the conditions which necessitated foster care for J.R. and P.E. Under the plan, Mother was to undergo a psychological evaluation, to sign a release allowing DCS to have access to the evaluation, to comply with the order of protection requiring Grandmother to stay away from the children, to develop a safety plan, to complete counseling to address her own abuse as well as the abuse of her children, to learn and understand the type of abuse with which J.R. was diagnosed, Munchausen Syndrome by Proxy, to obtain stable employment or public assistance, as well as a stable residence for at least six months, to complete a parenting class, to learn about children diagnosed with "failure to thrive", and to maintain consistent visitation with the children. In addition, Mother understood she was to furnish DCS with evidence of her compliance with the permanency plan for J.R. and P.E. These requirements clearly addressed the conditions that necessitated foster care and that prevented the girls from safely returning to Mother's custody.

In this case, the undisputed evidence establishes that Mother's employment had been sporadic at best, and she was unemployed the date of the hearing. Mother had not had a stable, suitable residence, and she was once again living with a boyfriend. Mother visited the children only eleven times in nearly two years, including the occasion on which absconded with them. Mother was unwilling to comply with the no-contact order regarding Grandmother. It is undisputed that Grandmother accompanied Mother on at least two of the occasions on which Mother did visit the children, and Mother even went so far as to dishonestly characterize Grandmother to DCS as a "family friend." Moreover, although Mother seeks to blame her attorneys for failing to apprise DCS of her progress towards compliance, the fact is that the responsibility was Mother's and she failed to do so. Mother argues on appeal that, in finding this ground established, the trial court relied upon inadmissible testimony and that Mother in fact substantially complied with the permanency plan. This is clearly not the case. The undisputed evidence shows that Mother failed to comply with virtually all of the most important requirements of the permanency plan, such as finding stable employment and a stable, suitable residence, and protecting the children from contact with Grandmother. Once again, this ground was clearly established by clear and convincing evidence, even undisputed, evidence.

Finally, the third ground for termination of parental rights relied upon by the trial court is known by the shorthand "persistent conditions," that is, the child has been removed from the home of the parent or guardian for at least six months, and the conditions which led to the child's removal persist or other conditions which would likely result in further abuse or neglect persist, thereby preventing the child's safe return to the care of the parent or guardian, and there is little likelihood that these conditions will be remedied in the near future, and "continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home." Tenn. Code Ann. § 36-1-113(g)(3)(A) (2001). We must examine the conditions

14

which led to the removal of J.R. and P.E. from Mother's care, as well as other conditions regarding Mother's case which would likely lead to further abuse or neglect.

From Dr. Walling's testimony on his interview with Mother, which drew no objection from Mother's counsel, from undisputed evidence and documents introduced into evidence by Mother, and from Mother's own testimony, a sad picture emerges of Mother's circumstances leading up to the children's removal. After a childhood in which she was abused in separate households by her father and her mother, or placed in foster care, Mother reached adulthood with two daughters and little skill at living independently. With only sporadic employment, after being "kicked out" by her most recent boyfriend, Mother found herself and her daughters staying at Grandfather's home, despite the fact that Mother was likely abused by Grandfather as a child and despite clear indications that Grandfather may have already sexually abused her child. Believing she had little alternative, Mother closed her eyes to the likelihood of further abuse until the situation became intolerable. Finding herself once again homeless with little means to support herself and her daughters, Mother fled to her mother's home in Tennessee. Once again closing her eyes to the likelihood that Grandmother abused her as a child and could abuse her daughters in the same way, Mother left her children alone in Grandmother's care and returned to Arkansas. Predictably, J.R. and P.E. were abused by Grandmother and ultimately ended up in protective custody in Tennessee.

When Arkansas officials refused to take the case, Tennessee officials could only offer assistance to Mother in Tennessee. Mother, however, refused to move to Tennessee for help remedying her plethora of problems, and was unable even to communicate to Tennessee officials her efforts in Arkansas.

Consequently, by the time of trial, many of the conditions which led to the children's removal or would likely result in future abuse or neglect remained largely unchanged. Mother remained in Arkansas, unemployed, without transportation and living with yet another boyfriend. During the time in which the children were in foster care, Mother had paid no financial support for their care. By Mother's testimony and the documents admitted into evidence by her counsel, it is clear that Mother was unwilling or unable to grasp the fact that Grandmother was a real danger to her children. From this evidence, it is clear that, if J.R. and P.E. were returned to Mother's custody, they would likely also be faced with a childhood of abuse and neglect. By clear and convincing evidence, the "persistent conditions" ground for termination of Mother's parental rights is established as well.

Once grounds for terminating parental rights have been established, the State must show that termination of the parent's rights is in the child's best interest. Tenn. Code Ann. § 36-1-113 (c)(2) (2001). The statute includes a non-exhaustive list of nine factors courts are to consider in making this determination:

> (i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

15

(1) Whether the parent or guardian has made such an adjustment of circumstances, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113 (i)(1)-(9) (2001).

Virtually all of these factors indicate that termination of Mother's parental rights was in the best interest of J.R. and P.E. Mother had made little adjustment in her circumstances, showing that lasting adjustment "does not reasonably appear possible." She failed to maintain regular visitation with J.R. and P.E. The evidence indicated the lack of a meaningful relationship between Mother and the children; indeed, even the sporadic visits from Mother resulted in turmoil and regression in the children. The evidence showed clearly that Grandmother, the perpetrator of the abuse which led to the children's removal from Mother's care, remained an integral part of Mother's life. Apparently, without the ability to support herself and her children, Mother's physical environment remained

16

uncertain and dependent on the boyfriend or other person with whom she lived. Mother's inability to come to terms with Grandmother's abuse of her children left her unable to protect them and unable to "effectively provid[e] safe and stable care and supervision" for J.R. and P.E. Finally, Mother paid no child support for her daughters. Clearly virtually all of these factors mitigate in favor of a finding that termination of Mother's parental rights was in the children's best interest.

Thus, even disregarding evidence which could have been deemed inadmissible hearsay had objections to hearsay evidence been permitted and properly ruled upon, the evidence supporting the trial court's decision is overwhelming. Under these circumstances, the decision to terminate Mother's parental rights must be affirmed.

The decision of the trial court is affirmed. Costs are assessed against Appellant, Erika Everson, for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE